OPINION OF THE COURT
Margaret Taylor,- J.
These three cases, consolidated by stipulation, come before the court on defendants’ motions to dismiss on the ground of forum non conveniens. (CPLR 327.) Plaintiffs’ choice of forum is being vigorously contested, probably not so much because defendants are unaccustomed to international travel, but because, as both sides know, the outcome *992 of this procedural motion may well be dispositive of plaintiffs’ claims.
Plaintiffs are three English women and their husbands. The women sue for serious personal injuries claimed to have resulted from ingestion of prescribed oral contraceptives. Their husbands sue for loss of consortium. Defendant American Home Products Corporation (AHP) is a Delaware corporation with its main office or principal place of business in New York. Wyeth Laboratories, Division of American Home Products Corporation is not a discrete legal entity but merely a part of AHP. Defendant Wyeth Laboratories, Inc. (Wyeth Labs), a wholly owned subsidiary of AHP, is a New York corporation which does business in New York and has its principal place of business in Pennsylvania.
In Action No. 1 plaintiff Gwendoline Bewers claims that on the advice of her physician and without knowledge of the high risk of dangerous side effects she bought and used Ovran for approximately three years in accordance with the instructions included with the drug and that on April 17, 1977 she suffered a severe and disabling thromboembolic accident resulting, inter alia, in impairment of left-side bodily function, partial paralysis and impairment of speech. She claims that she can neither move nor speak normally and that she is incapable of gainful employment. Plaintiff Sandra Clifton in Action No. 2 makes similar allegations and claims to have suffered a similar thromboembolic accident on March 21, 1977.
In Action No. 3 plaintiff Sandra Jay Howells claims to have taken Ovranette and Gynovlar on the advice of her physician for approximately 10 months and in March, 1977 to have suffered a severe thromboembolic accident resulting, inter alia, in impairment of right-side bodily functions, partial paralysis, inability to move properly and incapacity for gainful employment.
Plaintiffs claim that defendants AHP and Wyeth Labs alone or together with the here unrepresented defendants with whom they acted in concert as joint venturers, caused the marketing, sale and distribution of Ovran, Ovranette and Gynovlar, three oral contraceptives, throughout the *993 United Kingdom; that defendants actually knew that use of these drugs as oral contraceptives entailed an unreasonably high risk of dangerous side effects resulting in serious injury, disability or death; that, notwithstanding this knowledge, defendants unreasonably and intentionally and deliberately caused Ovran, Ovranette and Gynovlar to be distributed and marketed throughout the United Kingdom; and that defendants failed to give adequate warnings of the dangers in using these drugs.
Plaintiffs allege that defendants developed, tested, manufactured, advertised, marketed and sold the drugs in question within the United States at least as early as the early 1960’s; that at an unspecified time thereafter the Food and Drug Administration required that a label warning of the possible severe side effects of these drugs accompany their sale; and that thereafter defendants discontinued sale of these drugs in the United States and arranged for their distribution and sale within the United Kingdom, where the regulation of drugs is less stringent than in the United States and warning labels to the ultimate consumer are not required.
Plaintiffs sue for compensatory and punitive damages on six causes of action, described here in summary form: negligent manufacture and failure to warn; intentional misrepresentation and fraudulent concealment; breach of express and implied warranties; violation of strict liability in tort by unreasonably putting into the stream of commerce as a contraceptive a defective and dangerous product, made the more dangerous for failure to warn; and loss of consortium.
Defendants claim that since the injuries sued for occurred in England and since the drugs in question were prescribed, bought and ingested in England, these suits should be litigated in England rather than in New York. Defendants claim, moreover, that the drugs in question were tested, manufactured and marketed in England by or on behalf of an English company, John Wyeth and Brother, Ltd. Although defendants offer to submit to the jurisdiction of an English court as a condition of dismissal of these suits, they maintain that they are not the proper defendants to defend these suits and that suit should be brought *994 against John Wyeth and Brother, Ltd. Defendants have not, however, moved for dismissal for failure to state a cause of action.
John Wyeth and Brother, Ltd. (JWB), is a wholly owned subsidiary of defendant AHP. A crucial active ingredient in Ovran, and the ingredient alleged to have caused the injuries complained of in Actions Nos. 1 and 2, is norgestrel. JWB pays royalties to AHP for the use of norgestrel. Ovran is the same combination that has been tested and marketed in countries other than Great Britain by other subsidiaries of AHP.
The crucial active ingredient in Ovranette, and the substance alleged to have caused Ms. Howells’ stroke, is the synthetic progestin levonorgestrel. Defendant AHP holds the exclusive license on levonorgestrel and JWB pays royalties to AHP for the use of levonorgestrel.
Largely a product of case law, the doctrine of forum non conveniens allows local courts to dismiss cases in which both subject matter and personal jurisdiction technically exist but which have so minimal a relationship with the forum State that the burden on the forum’s judicial resources is not justified. (Siegel, New York Practice, p 28.) The court’s inquiry must evaluate both the private interests at stake — the parties’ interest in litigating the matter conveniently and justly — and the public interests — the States’ interest in conserving judicial resources, the burden of applying foreign law if applicable and the policies relevant to the substantive issues raised in the lawsuit. (Gulf Oil Corp. v Gilbert, 330 US 501, 509; Silver v Great Amer. Ins. Co., 29 NY2d 356; Varkonyi v S. A. Empressa de Viacao Airea Rio Grandense [Varig], 22 NY2d 333; Bader & Bader v Ford, 66 AD2d 642, app dsmd 48 NY2d 649.)
ADEQUATE ALTERNATIVE FORUM
The Supreme Court has highlighted the many disadvantages to plaintiffs (all present here) and the correlative advantages to defendants (all present here) if defendants, through forum non conveniens dismissals, are able to get a transfer of a case to a jurisdiction outside of the United States. “First, all but 6 of the 50 American States * * * offer strict liability * * * Rules roughly equivalent to American *995 strict liability are effective in France, Belgium, and Luxembourg. West Germany and Japan have a strict liability statute for pharmaceuticals. However, strict liability remains primarily an American innovation. Second, the tort plaintiff may choose, at least potentially, from among 50 jurisdictions if he decides to file suit in the United States. Each of these jurisdictions applies its own set of malleable choice-of-law rules. Third, jury trials are almost always available in the United States, while they are never provided in civil law jurisdictions * * * Even in the United Kingdom, most civil actions are not tried before a jury * * * Fourth, unlike most foreign jurisdictions, American courts allow contingent attorney’s fees and do not tax losing parties with their opponents’ attorney’s fees * * * Fifth, discovery is more extensive in American than in foreign courts.” (Piper Aircraft Co. v Reyno, 454 US 235, 252, n 18.)
The absolute precondition of dismissing a case on the ground that the forum in which it has been brought is inconvenient is the existence of an alternative forum where the suit may fairly and effectively be brought. Only if such a forum exists may the court consider whether its own convenience and that of the parties could best be served by having the suit brought in that alternative forum. (Gulf Oil Corp. v Gilbert, 330 US 501, supra; Silver v Great Amer. Ins. Co., 29 NY2d 356, supra; Mollendo Equip. Co. v Sekisan Trading Co., 56 AD2d 750.)
A transfer of this case to England would result in a forfeiture of plaintiffs’ strongest cause of action, i.e., their strict products liability claims. New York courts should adopt the reasoning of the Third Circuit in that case rather than that of the Supreme Court reversing that decision. (Reyno v Piper Aircraft Co., 630 F2d 149, revd 454 US 235, supra.)
Such a dismissal would also result in substantial procedural disadvantages to the plaintiffs with, of course, concomitant advantages to the defendants.
It is however the consensus of the courts that procedural differences alone may not preclude forum non conveniens dismissal. (Shields v Mi Ryung Constr. Co., 508 F Supp 891; Panama Processes v Cities Serv. Co., 500 F Supp 787.) *996 They should certainly be considered, however, in deciding whether a particular foreign jurisdiction is a fair and just alternative forum. Obviously, from a procedural point of view, Britain is not an adequate alternative forum for the plaintiffs in this case.
Additionally, in the instant suits, plaintiffs might well be barred from bringing these actions in an English court. Section 2 A of the Limitation Act of 1939, as inserted by the Limitation Act of 1975, provides that all actions to recover for a personal injury must be brought no later than three years after the injury or after plaintiff’s knowledge of the injury, whichever is later. (45 Halsbury’s Statutes of England [3d ed], p 848.) For all six plaintiffs, this period ended in the spring of 1980.
Section 2D as inserted by the Limitation Act of 1975 provides that where it is equitable to do so, the court in which an action is brought may override the statutory time limit. The court is to look to the degree to which plaintiff would be prejudiced by application of the limitation and the degree to which defendant would be prejudiced by a decision to disallow the limitation. The act lists particular circumstances that the court must consider in coming to a decision. In a 1978 case the Court of Appeal, Civil Division, held that the courts have unfettered “discretion” to disallow the limitation “where it is fair and just to do so”. (Firman v Ellis [1978], 2 All ER 851, 863, Lord Denning MR.) But in a somewhat later case, the Court of Appeal made it plain that the statutory limitation was not lightly to be disallowed. (Jones v Searle & Co. [1978], 3 All ER 654.)
As a condition of dismissing the instant actions, this court could require defendants to waive their defenses under the Limitation Act if plaintiffs should sue them in England. Such a condition, of course, would not limit the discretion of an English court to apply or to disallow the limitation. Nor, apparently would the English court’s discretion be hedged by defendants’ waiver. Section 2D provides that the court may disallow the limitation “[i]f it appears to the court that it would be equitable to allow” the action to proceed (emphasis added).
*997 Whether plaintiffs would have an adequate forum in England if their actions are dismissed in New York is uncertain, at best. If these cases are conditionally dismissed and plaintiffs’ attempt to bring them in England is rebuffed, they will then have to return here after significant delay and additional expense. This prospect imposes on defendants a somewhat heavier burden to show that New York is an inconvenient forum than they would bear if an adequate alternative forum were unambiguously available.
CONVENIENCE
The court now turns to what is, after all, the “central focus” of a forum non conveniens inquiry: convenience. (Piper Aircraft Co. v Reyno, 454 US 235, supra.) It is defendants’ burden “clearly [to] establish that New York is an inconvenient forum and that another is available which will best serve the ends of justice and the convenience of the parties.” (Bader & Bader v Ford, 66 AD2d 642, 645, app dsmd 48 AD2d 649, supra.)
Defendants’ claim that New York is an inconvenient forum is made in little more than one page of their 25-page brief in support of their motions to dismiss. While a good argument can be made succinctly, convenience is largely a matter of particular facts, and facts must be set forth if they are to persuade. Defendants’ contentions as to their inconvenience are made in a series of blanket and conclusory statements, all relating to testimonial evidence. They . claim that virtually all the relevant evidence and necessary witnesses are located in the United Kingdom: that “among the more important witnesses will be the prescribing and treating physicians, as well as the John Wyeth and Brother, Ltd. officials responsible for licensing and marketing the pharmaceutical”; that “the cost of transporting all cooperative witnesses to the United States would be exorbitant”; that “unwilling witnesses would be beyond the court’s power to compel attendance at trial”, and that letters rogatory are not a satisfactory substitute for live testimony. No further details are provided.
Against this, plaintiffs contend that it is they who will bear the burden, of proof at trial, both as to liability and as *998 to damages, and that it is they, not defendants, who will need to provide the evidence necessary to prove their case. Proof of causation and of damages clearly will require the testimony of “the prescribing and treating physicians”. Plaintiffs have evidently calculated that it is worthwhile for them to bring this testimony to New York, given that, in their view, the testimonial and documentary proof of the wrongs alleged is far more extensive and that all of that proof is to be found here. Since the evidentiary burden and the expense of bringing their proof to New York will be theirs to bear, that calculation is theirs to make unless defendants are prejudiced thereby.
Additionally, there is a vast imbalance in the amount of documentary evidence that would need to be shipped transAtlantically depending on where these cases are tried. According to an affidavit prepared for G. D. Searle & Co., in response to plaintiff’s interrogatories in a similar case (No. 77 L 19022) and submitted by plaintiffs here, a new drug application for an oral contraceptive weighs approximately 400 pounds. The new drug applications for Ovran, Ovranette, and Gynovlar would be only three of the many documents that would need to be sent to England if these cases were to be dismissed. In addition, massive documentation regarding, inter alia, contacts with the Food and Drug Administration and marketing decisions, such as the decisions to halt sales in the United States and to commence sales through JWB in the United Kingdom, would need to be sent. The bulk of the voluminous records relevant to these cases is here, not in England. (See Strain v Seven Hills Assoc., 75 AD2d 360; ABKCO Inks. v Lennon, 52 AD2d 435.)
In sum, it appears that the larger number of witnesses is in New York, not in England, and that the vastly larger part of exceedingly bulky documentary evidence is also to be found in New York or within a 100-mile radius of New York. Defendants have failed to show that it would be more onerous for them to defend these cases in New York than in England. A fortiori, they have failed to show that they would be more inconvenienced by trial in New York than plaintiffs would be by trial in England.
*999 Even if the private interests were evenly balanced rather than weighing, as they do, in favor of plaintiffs, the court should not dismiss the action. The balancing test applied in a forum non conveniens case is not an equal one. Unless the balance of private convenience is strongly in favor of the defendants, the plaintiffs’ choice of forum should not be disturbed. (See, e.g., Cives Corp. v William Corbitt, Inc., 63 AD2d 825; Traub v Robertson-American Corp., 82 Misc 2d 222.)
A multinational corporation cannot expect to defend itself in international litigation without transporting evidence. In the instant cases, neither a New York forum nor an English one would obviate the need to transport witnesses and documents across the Atlantic. “A forum is not necessarily inconvenient because of its distance from pertinent parties or places if it is readily accessible in a few hours of air travel. It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit. Jet travel and satellite communication have significantly altered the meaning of ‘non conveniens’ ”. (Calavo Growers of Cal. v Belgium, 632 F2d 963, 969 [Newman, J., concurring]; see, also, Manu Int. v Avon Prods., 641 F2d 62.)
It would be an unwise precedent to “allow a resident defendant with international operations to thwart the plaintiff’s choice of forum by claiming to be inconvenienced by a lawsuit in its home forum.” (Jones v Searle Labs., 100 Ill App 3d 165, 169.)
PUBLIC INTERESTS AND CHOICE OF LAW
That the balance of private convenience favors plaintiffs’ choice of forum does not, however, mandate denial of defendants’ motions. The court has public interests to consider, too. (See Gulf Oil Corp. v Gilbert, 330 US 501, supra; Bata v Bata, 304 NY 51.)
The factors affecting the public interest include the following: the burden on a local jury and on court calendars; whether the pending action has sufficient contacts with New York, including the extent of the parties’ presence in the State; whether the action arose in New York; whether another jurisdiction has a greater interest in the *1000 litigation; whether another jurisdiction’s laws govern the substantive issue; and whether the litigation affects the public policy of another jurisdiction. (See Stanton v Hellenic Lines, NYLJ, Feb. 16, 1982, p 6, col 1; Silver v Great Amer. Ins. Co., 29 NY2d 356, supra; Gulf Oil Corp. v Gilbert, 330 US 501, 508, 509, supra.)
The tortious conduct complained of is the decision allegedly made here in New York to “dump” unsafe drugs onto a specific foreign market and, further, to do so without warning of the disproportionate dangers of using them as birth control pills. (See Lindsay v Ortho Pharm. Corp., 637 F2d 87, 91; Mahr v Searle & Co., 72 Ill App 3d 540; Stevens v Parke, Davis & Co., 9 Cal 3d 51.)
Unlike the vast majority of tort cases in which forum non conveniens is an issue, the instant cases do not arise out of an accident, which can happen as readily in one place as another. The tortious acts here alleged involve calculation and decision, that is, intentional and deliberate conduct. This conduct, the making of defendants’ relevant corporate decisions, is claimed, without contradiction, to have occurred not in England, but in New York.
In Strain v Seven Hills Assoc. (75 AD2d 360, supra) a motion to dismiss a derivative action on behalf of an Ohio partnership with an office in New York on forum non conveniens grounds was denied on the ground that although the acts complained of were committed in Massachusetts, the supervisory decisions that the acts be committed were made in New York. That plaintiffs here, unlike those in Strain, are not New York residents pales beside the fact that here, unlike Strain, the supervisory decisions themselves are the alleged tortious acts complained of. See Kermisch v Avis Rent A Car Systems (71 AD2d 790), where, although the damage was suffered abroad, the alleged tortious misrepresentations occurred in New York.
Defendants have not adduced, and the court in its own research has not discovered, a single case which has been dismissed for lack of a substantial nexus with New York where defendants were residents of New York and the tortious acts complained of were intentional and committed in New York.
*1001 Courts which have granted forum non conveniens dismissals in similar cases have based their decisions on their view of the public interest factors — primarily as they are inevitably and inextricably interwoven with the choice of law question. In effect, these courts have held that, even assuming all plaintiffs’ claims and facts as alleged in the complaints are true, the law of the place of the injuries governs rather than the law of the place of the tortious act.
Recently, the Court of Appeals declared, albeit in dictum, that the lex loci delicti rule is to be applied in tort cases except in “extraordinary circumstances”. (Cousins v Instrument Flyers, 44 NY2d 698, 699.) See, also, Grancaris v Hass Co. (79 AD2d 551, 553), in which the Appellate Division in the First Department held that tort cases are subject to lex loci delicti except in “rare instances”.
It must not be forgotten, however, that the “American Conflicts Revolution” was in large part sparked by our own Court of Appeals in Babcock v Jackson (12 NY2d 473). If there is one consistent thread throughout all conflicts chaos and confusion, it is the almost unanimous opinion of courts and scholars that a rigid application of the lex loci rule was in the past, is now and would be in the future, unsound, unfair and unjust, particularly in the new world of extensive multinational travel and trading. The very reason for the conflicts chaos in tort law was the strong feeling of the courts that strict adherence to the traditional conflicts rule of lex loci delicti in tort cases was simply unjust.
The growth of international trade, the rise of multinational corporations and the relative ease of transporting people and goods abroad have resulted in the emergence of international products liability litigation. The potential for such litigation arises in numerous contexts. The courts, and particularly those in New York State with its extensive multinational contacts, are on the threshold of incredibly complex forum non conveniens and choice of law problems which cannot be resolved simply by a mechanical application of lex loci. Since many multinational corporations not only are doing business in New York, but have their headquarters here, our courts will be confronted continually with lawsuits by foreign plaintiffs arising out *1002 of activities controlled by New York corporations. The British birth control pills cases involved here are not the only problem of this nature. Witness, e.g., the claims concerning Nestle powdered milk, thalidomide, Depo Provera, Oraflex (the arthritis pain killer recently withdrawn from the market) and others. (See Richter, Pesticides and Pills for Export Only, part two, transcript of television broadcast on Public Broadcasting System, Oct. 7, 1981.) Indeed, an amendment of the Export Administration Act of 1979 (US Code, tit 50, Appendix, § 2401 et seq.) to restrict the export of goods which have been found to be hazardous to the public health has been proposed. (H.R. No. 2439, 97th Cong, 1st Session.)
The trend toward uniformity in products liability law, i.e., towards consumer protection and the rule of strict products liability, suggests that the courts in this country should be reluctant to retain jurisdiction over transnational products liability litigation and certainly less reluctant to apply the forum’s strict products liability law.
As Friedrich K. Juenger states in a recent article (American and European Conflicts Law, 30 Amer J of Comparative L 117, 128-129): “Clearly, there may be good reasons for offering plaintiffs a choice of fora. You may recall the action brought by Dutch, farmers against French mining interests that polluted the Rhine River and damaged seedbeds in Holland. The Court of Justice of the European Communities wrote an opinion that, in effect, condoned forum shopping when it stressed the desirability of keeping alternative fora open to tort victims. A similar endorsement of plaintiff’s choice inheres in the European Judgment Convention’s provisions on support claimants, consumers and policyholders.”
At the very least, it should be recognized that the instant cases, involving an allegation that a New York tort-feasor intentionally and unjustifiably caused injuries to innocent persons outside the State, present Cousins’ {supra, p 699) “extraordinary circumstances” or Grancaris’ {supra, p 553) “rare instances” which preclude a rigid application of the lex loci delicti rule.
As stated above, in Cousins (44 NY2d 698, 700, supra), the Court of Appeals remarked that it would be “incongru *1003 ous” to adopt the proposal of the United States to the Hague Conference of 1972 with regard to choice of law rules for products liability cases. Nevertheless, this court respectfully urges that the appellate courts of this State give serious consideration to the substance and theories of that proposal.
Consistent with the purposes behind the development of strict products liability law and the rejection of the lex loci rule, New York should adopt in products liability cases (such as those involved here) the substance if not the exact words, of the suggestions of the United States to the Special Commission, Hague Conference on Private International Law, September, 1970 (as modified by this court to include the forum and the State of manufacture): “The plaintiff should be given the choice of any one of these laws or forums: the law or forum of the state of injury, the law or forum of the state where the plaintiff acquired the product, the law or forum of the state of manufacture or the law or forum of the state of defendant’s main office or principal place of business; provided that in the case of the state of injury or of acquisition, the defendant could reasonably foresee that the particular product, or products of similar type which it decided to manufacture or sell, would come into the state through commercial channels.” An injured person should be able to sue the primary tort-feasor — the decision maker — on its home turf under home turf law. The Federal Tort Claims Act (US Code, tit 28, § 2672), for example, applies the law of the place where the tortious act or omission occurred, not the place of injury.
By allowing plaintiffs to choose, inter alia, the law of a defendant’s State, these rules would significantly increase the uniformity of result among cases brought by plaintiffs who have been injured in different States by the same product of the same supplier, as well as among cases where the products of suppliers from the same State cause injury in two or more different States. Predictability of result would be enhanced, as would be the possibility of reasonable insurance by suppliers. These rules would be fair to plaintiffs since plaintiffs would have a choice, though limited, of forum and law. They would be fair to defendants because plaintiffs’ choices would be rigorously circum *1004 scribed by defendants’ prior operating and marketing choices. By the time plaintiffs have the unenviable occasion to choose which forum and law should apply, defendants have long since chosen where to operate and where to market their goods.
Defendants argue that Britain has not chosen to adopt strict products liability absent privity because it has decided to retain a negligence standard which protects and encourages industry by making it more difficult for consumers to recover. They claim that British policy was clearly intended to include defendant’s British subsidiary under its protective wing and, to the extent that this court applies New York strict products liability law to AHP, it necessarily impairs that British policy.
Assuming, however, that a purpose may be discerned in or ascribed to the absence of strict products liability from current English law, that purpose can only be to shield from liability manufacturers or suppliers whose goods prove injurious. To the extent that the operations of AHP’s British subsidiary will be fettered by imposing strict liability upon its parent corporation, those restrictions are at the service of greater consumer health protection, a policy in which New York has an emphatic interest.
This interest, of course, comports with the international trend toward consumer-oriented products liability law. Such a trend substantially weakens the argument that New York’s interest in compensating plaintiffs conflicts with the interests of other countries in encouraging industry. The implications of this trend are that individuals have certain rights which are superior to and transcend a governmental policy of encouraging local industries — particularly, if that policy results in making innocent persons bear the costs of injuries they suffer as a result of using the defective products of such industries. If the injured persons can afford it, the least they should be permitted to do is to sue in forums which will apply laws more favorable to their claims if such forums have some relation to the dispute.
It is not at all clear from the proof submitted on these motions that British policy will be impaired by a New York court affording British citizens a higher standard of protec *1005 tion and greater compensation than they might have obtained at home. Britain would surely have no interest per se in denying greater compensation to its residents. Although the State in which an injury occurs, or whose citizens are injured, generally has an interest in having its law apply so that the injured, or those who have cared for the injured, are recompensed (see, e.g., Macey v Rozbicki, 18 NY2d 289), it “is unlikely * * * that the state of acquisition or injury would have any objection if a liability stricter than that which would be imposed by its own law for the benefit of a person injured within its territory were imposed upon an out-of-state supplier.” (Reese, Products Liability and Choice of Law: United States Proposals to Hague Conference, 25 Valid L Rev 29, 33.)
In further support of their speculation that British interests would be impaired by the application of New York strict products liability to the activities of AHP in New York, defendants argue that the drugs involved here passed the licensing requirements of Britain and it would be presumptuous and paternalistic for New York to impose its own higher standard of care on foreign conduct when that conduct complied with that foreign law. This court does not agree.
It would seem unwise to base choice of law and forum non conveniens decisions on the nebulous standard of the extent of the pervasiveness of a particular government’s regulatory policies. Such a standard would reinstitute in a different form, all the chaos presently existing in determining competing “governmental interests”. Courts should not be required to speculate on just how pervasive a foreign government’s regulatory scheme must be to trigger presumptuousness on the part of New York courts.
For the purposes of these motions, the court assumes compliance with English drug statutes (excepting, of course, plaintiffs’ allegations of fraud). But compliance with minimum government requirements, even our own State government’s, does not necessarily constitute compliance with the duty of care owing to consumers. (Stevens v Parke, Davis & Co., 9 Cal 3d 51; Incollingo v Ewing, 444 Pa 263; see Harrison v Wyeth Labs., Div. of Amer. Home *1006 Prods., 510 F Supp 1, 5; Woodill v Parke, Davis & Co., 79 Ill 2d 26.)
The issue in drug cases is not only compliance with government regulations and the adequacy of the warnings to the doctors (or to the consumer of the drugs or to both), but also whether the drugs were so useful and desirable in treating the “problem” (i.e., pregnancy) that the risks attending their use were, in fact, reasonable risks. Reasonableness is measured by balancing the risks of the “cure” against the risks of the “problem”. Plaintiffs contend here that AHP knew or should have known that the use of these drugs created an unreasonable risk considering the “problem” (pregnancy) they were prescribed to cure. Thus, it could be argued that prescribing these drugs to cure cancer would be reasonable whereas prescribing them to cure “pregnancy” would not.
Compliance with standards laid down by a body such as the Food and Drug Administration in the United States or the Medicines Commission in England cannot by itself be taken to indicate a drug is not defective and should not be regarded in itself as a reason why producers of pharmaceuticals should not be strictly liable.
The overwhelming number of products liability cases in the United States involve products which probably have met minimum government requirements. Such compliance by a United States company does not preclude a claim that, despite such compliance the product was defective. No court considers it presumptuous or harmful to our own “pervasive regulatory scheme” if individuals sue entities claimed to be responsible for putting injury-causing prescription products in the stream of commerce. Although proof of unreasonableness may be quite difficult, plaintiffs are certainly not precluded from suing merely because of our pervasive governmental regulatory scheme.
Nevertheless, a decision to subordinate the British policy to our own by denying a forum non conveniens dismissal would not be based merely upon a preference for strict products liability as a “better rule of law”. (Leflar, American Conflicts Law, p 245 [2d ed, 1968]; Pahmer v Hertz Corp., 36 AD2d 252, affd 32 NY2d 119.) Rather, it is *1007 the view of the court that if AHP decided to create a foreign subsidiary to be a conduit for pharmaceuticals that could not be marketed at home because of known potential health hazards, such conduct could be found to be tortious. (Chance v DuPont De Nemours & Co., 371 F Supp 439, 445.) A thinly veiled subterfuge by corporate fiction could be considered an impermissible attempt to circumvent the consumer protection policies of this country. By piercing that corporate veil, a jury could find that AHP cannot insulate its tortious “decision to dump” unsafe products abroad (assuming such decision was, in fact, made), notwithstanding the fact that its subsidiary may continue to enjoy the protection of British policy. Surely, Britain can have no interest in protecting AHP, a wholly American company, in these circumstances.
New York should not adopt an “Independent Subsidiary” rule to shield AHP or any other American company from liability for decisions made by the principal in the United States to sell defective products abroad. It cannot be disputed that AHP could, if it wished, immediately stop its wholly owned English subsidiary from manufacturing and distributing these contraceptive drugs. A forum non conveniens dismissal should not be granted on the pure legal fiction that the parent corporation and its wholly owned subsidiary are separate entities and the acts of one should not be imputed to the other. The tort-feasor here, if there is any, is AHP. An “independent subsidiary” exception in strict products liability law not only elevates fiction above fact but would involve the courts in an unending and fruitless debate on just how independent is independent for the purpose of a forum non conveniens motion. Such a debate would ultimately become so convoluted and confusing as to yield no law at all. Further, if the so-called “independent subsidiary” rule became the law, corporate books of multinational corporations could be appropriately “prepared” to show the independence of their subsidiaries as easily as they have been “prepared” to hide bribes to foreign government officials.
No matter what theory is used, the choice of New York law in this lawsuit, is not fortuitous nor should it surprise defendants although they allege they planned their alleged *1008 tortious activities in accordance with British law. Since New York, where AHP’s principal offices are, Delaware, where it is incorporated and the vast majority of American jurisdictions in which AHP does a profitable business all have strict products liability, it cannot be unfair to impose that standard on this American company’s decisions.
In adopting the doctrine of strict products liability New York has committed itself to a policy of holding local industries accountable for their unconscionable decisions to profit from products that create unreasonable risks to the health of consumers anywhere. That commitment should not end at the State’s geographical boundaries. The realities of modern technology, travel and communication are such that a business with international operations could make a mockery of a strict products liability doctrine confined to territorial effect. This court should not permit a local corporation to circumvent and flout the law and social policy of this State for its own economic benefit by deflecting onto a foreign subsidiary all liability for the decisions and products tunneled through that subsidiary but conceived at home.
It is alleged that the defendants deliberately chose to find a foreign market for these drugs after the Food and Drug Administration regulations precluded their distribution at home. The United States and the State of New York clearly have an interest in deterring such alleged unconscionable business decisions on the part of its corporate residents. “Organizations may choose New York as the focus of their activities for a variety of financial, political, social or legal considerations, among others. Once these organizations choose to operate within New York’s borders, and their activities in New York give rise to legal obligations, New York has a continuing strong interest in the regulation of their activities. There would be little question, for example, of the legitimacy of New York’s interest in regulating physical acts of a tortious nature by such organizations — even where the consequences of such tortious acts are felt outside the state. When decisions of a tortious nature to act — or to refrain from acting — are formulated in New York, this state’s interest in the regulation of these decisions is equally legitimate. The ‘intangi *1009 ble’ nature of such tortious acts cannot deprive the state where the act took place of its inherent interest in regulating that conduct.” (Chance v DuPont De Nemours & Co., 371 F Supp 439, 445, supra.)
New York’s interest in having its law apply is clear. By holding defendants liable, even absent proof of negligence, the doctrine of strict liability in tort not only distributes the cost of injury but also motivates New York companies who place products into the stream of commerce to take steps to assure that those products are safe. As the Court of Appeals noted when it extended to innocent bystanders the right to sue in strict liability: “[t]o impose this economic burden on the manufacturer should encourage safety in design and production” (Codling v Paglia, 32 NY2d 330, 341; see, also, Caprara v Chrysler Corp., 52 NY2d 114, 125; Calabresi, Optimal Deterrence and Accidents, 84 Yale LJ 656; Calabresi & Hirschoff, Toward A Test For Strict Liability In Torts, 81 Yale LJ 1055, 1074-1084).
The deterrent effects that flow from successful tort litigation instigated by foreign plaintiffs, will inure to the benefit of all New Yorkers (and all Americans) as well as to foreigners. For example, recent tort litigation begun by British citizens in a United States court following the Paris air crash acted as a catalyst for extensive revision of Federal air safety regulations.
CONCLUSION
It is settled law that so long as a case has a substantial nexus with the forum State, plaintiff’s choice of forum should not be disturbed unless the balance of convenience is strongly in favor of defendant. (See, e.g., Gulf Oil Corp. v Gilbert, 330 US 501, supra; Pain v United Technologies Corp., 637 F2d 775; Schertenlieb v Traum, 589 F2d 1156; Olympic Corp. v Societe Generale, 462 F2d 376; Bader & Bader v Ford, 66 AD2d 642, app dsmd 48 NY2d 649, supra; Rowell v Metromedia, Inc., NYLJ, Aug. 26, 1981, p 6, col 1.) Defendants here are not being sued in a forum far from their home (cf. Mollendo Equip. Co. v Sekisan Trading Co., 56 AD2d 750, supra), and plaintiffs’ choice of defendants’ home forum weighs heavily against dismissal. (See, e.g., Schertenlieb v Traum, supra.) The New York residence of a *1010 party, “without any distinction made between a resident plaintiff and a resident defendant,” is still an important factor which militates against dismissal of a case on forum non conveniens grounds. (Slaughter v Waters, 41 AD2d 810.)
But even if these general principles did not strongly urge retention of the instant cases, the court would allow them to proceed. For here, quite remarkably for a case sought to be dismissed for forum non conveniens, the balance of private convenience favors plaintiffs’ choice of forum. In addition, the nexus to New York is plain and substantial, and the availability of an alternative forum is uncertain.
On the major choice of law issue, New York law should be applied. The complications of international products liability litigation require sensible and easily applicable forum non conveniens and choice of law rules. New York is the headquarters or the principal place of business of many multinational corporations. It should not, however, be merely the center for 'corporate headquarters but also the leader in developing laws to protect innocent persons from wrongful activities of such corporations, wherever they choose to conduct their operations. New York should not become the haven of marauding tort-feasors.
Justice, fairness and convenience require that defendants’ motions be, and they hereby are, denied. (Silver v Great Amer. Ins. Co., 29 NY2d 356, supra; Bennett v Bennett, 64 AD2d 572.)